UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHARLES KALB et al.,

                Plaintiffs,

vs.                                             Case No.  3:07-cv-1061-J-33TEM

QUIXTAR, INC,

                Defendant.
_____/

**ORDER**

      This cause comes before the Court pursuant to Plaintiffs' Motion for Preliminary Injunction (Doc. #29), filed on January 22, 2008.  Quixtar responded to this motion on February 29, 2008. (Doc. #40.)  The Court held a hearing and heard oral argument on Plaintiffs' motion on March 25, 2008.  For the reasons stated below, the Court denies the relief sought.

**I.**      **Background**

      Quixtar is a Virginia corporation with its principal place of business in Michigan.  (Doc. #1 at 2.)  Quixtar is a successor to the Amway Corporation, and operates a sales and marketing system, which is implemented by Independent Business Operators.  (Doc. #40 at 3.)  In order to become an IBO, an individual enters a contract with Quixtar to sell Quixtar's products to other members and clients.  (Doc. #1 at 3.)  The individual signs a Distributor Agreement, which must be renewed every year in order for the individual to remain a Quixtar IBO.  (Doc. #40 at 5.)  The Plaintiffs, all Florida residents, became Amway or Quixtar IBOs at various times between 1987 and 2005, either by executing a distributor agreement in person or online via the internet.  (Doc. #1 at 4-6.)  Plaintiffs each renewed their respective IBO Agreements every year they were members of Quixtar.  (Doc. #40-2 at 5-9, Decl. of Mitchell.)

Quixtar filed a demand for arbitration on April 27, 2006, with JAMS Alternative Dispute Resolution Service, naming all Plaintiffs as Respondents. (Doc. #1 at 6.) Quixtar alleged various counts of breach of contract, tortious interference with an existing contract, tortious interference with an advantageous business relationship, and misappropriation of trade secrets. (Id. at 6-7.) These claims arose from Plaintiffs' alleged involvement with a Quixtar competitor, in violation of their Distributor Agreements. (Doc. #40 at 7.) Plaintiffs objected to the JAMS arbitrator, asserting that there was no arbitration agreement that required them to arbitrate Quixtar's claims. (Doc. #1 at 7.) JAMS suspended the selection of an arbitrator, pending resolution of the question of arbitrability, and arbitration was never commenced. (Id. at 8.)

On November 1, 2006, Plaintiffs' counsel suggested using the American Arbitration Association to conduct the arbitration and the rules of the AAA and Federal Arbitration Act to govern the arbitration. (Doc. #40 Ex. C.) Quixtar's counsel responded that Quixtar would agree to AAA arbitration, but would not agree to the change in the arbitration rules, demanding that the Quixtar IBOAI Arbitration Rules apply. (Id. Ex. D.) Plaintiffs' counsel agreed to an AAA arbitration, but not to the use of the Quixtar Rules. (Id. Ex. E.) Thereafter, Quixtar filed an arbitration demand with the AAA on January 10, 2007, seeking to apply the Quixtar Arbitration Rules. (Id. at 8.) On July 13, 2007, Plaintiffs filed a Motion to Dismiss the arbitration, contending that the arbitration agreement contained in the Quixtar Rules of Conduct did not require arbitration of any claims initiated by Quixtar. (Id.) The arbitrator denied the Motion to Dismiss on August 27, 2007, determining that Plaintiffs were contractually bound to arbitrate Quixtar's claims. (Id.) Plaintiffs then filed this action on November 16, 2007, asking for a judicial determination of the arbitrability of Quixtar's claims and enjoining arbitration.

**II.     Choice of Law**

Questions of whether or not a party has agreed to arbitrate a claim are questions for a court. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." Id. at 944. The Quixtar Rules of Conduct state that Michigan law applies, unless otherwise specified in the parties' contract. (Doc. #1-2 at 32, Quixtar Rule 11.5.21.)  Plaintiffs have implied that Florida law may apply, but acknowledge that Michigan law is required by the Rules of Conduct.  Quixtar states that the law of Michigan should apply, pursuant to the choice of law provision in the Quixtar Rules of Conduct. The Court will apply Michigan law in this case.

**III. Plaintiffs' Motion for Preliminary Injunction**

    **A.  Legal Standard for Preliminary Injunction**

A party seeking the issuance of a preliminary injunction must demonstrate the following: (1) that there is a substantial likelihood of success on the merits; (2) that there is a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the harm an injunction may cause defendant; and (4) that granting the injunction would not be adverse to the public interest. All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989).  Plaintiffs allege two counts, seeking: (1) a declaratory judgment that Quixtar's arbitration provisions are unenforceable; (2) an injunction to prohibit Quixtar from engaging Plaintiffs in arbitration.

"[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." United States v.

Jefferson County, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting Canal Authority v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974)).  Morever, the grant of a preliminary injunction is "the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." Seigel v. LePore, 234 F.3d 1163, 1180 (11th Cir. 2000) (citing United States v. Lambert, 695 F.2d 536, 539 (11th Cir. 1983).

      **B.**     **Substantial Likelihood of Success on the Merits**

Plaintiffs argue that the plain meaning of the arbitration agreement does not require them to arbitrate claims brought by Quixtar.  While there have been many different versions of the arbitration agreement between the parties over the years, Plaintiffs assert that the relevant arbitration provision is contained in the Quixtar Renewal Agreement, which states:

> I agree that I will give notice in writing of any claim or dispute arising out of or relating to my Independent Business, or the IBO Plan, or Rules of Conduct to the other party or parties, specifying the basis for my claim and the amount claimed or relief sought.  I will then try in good faith to resolve the dispute using the Conciliation and Enforcement Procedures contained in the Rules of Conduct for IBOs.
>
> If the claim or dispute is not resolved to my satisfaction within 90 days, or after the conciliation process is completed, whichever is later, I agree to submit any remaining claim or dispute arising out of or relating to my Independent Business, the IBO Plan, or the IBO Rules of Conduct (including a claim against another IBO, or any such IBO's officers, directors, agents or employees, or against Quixtar, Inc., Amway Corporation, or any of their officers, directors, agents, or employees) to binding arbitration in accordance with the IBO Arbitration Rules, which are set forth in the Business Compendium.

(Doc. #40-2 at 13.)

Both Michigan and Federal law favor construing contracts liberally to resolve any doubts in favor of arbitration.  AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986);

Omega Construc. Co. v. Altman, 382 N.W.2d 839, 841 (Mich. Ct. App. 1985). "Michigan's public policy favors arbitration in the resolution of disputes. Arbitration clauses in contracts are to be liberally construed. Any doubts about the arbitrability of an issue should be resolved in favor of arbitration." Omega Construc., 382 N.W.2d at 841. Under Michigan law, the determination of arbitrability requires a three-step process: (1) is there an arbitration agreement between the parties, (2) is the dispute in question covered by the contract and arbitration clause, and (3) is the dispute expressly exempt from the arbitration by the terms of the agreement. Armoudlian v. Zadeh, 323 N.W.2d 502, 506 (Mich. Ct. App. 1982). The parties do not dispute that an arbitration agreement exists between them, but dispute only whether the agreement requires arbitration of claims initiated by Quixtar against Plaintiffs. Plaintiffs argue that this arbitration clause is one-sided since it only references "I," and it only requires that the IBO must submit any claim it has against Quixtar to binding arbitration. They state that it is a valid contract agreement, but since it is one-sided, they are not required to arbitrate claims brought by Quixtar against them.

To this end, Plaintiffs cite to Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126 (7th Cir. 1997) and Iberia Credit Bureau Inc. v. Cingular Wireless LLC, 379 F.3d 159 (5th Cir. 2004), which both found that arbitration language that refers to one party exclusively only requires one party to arbitrate. In Gibson, an employee was required to sign an arbitration agreement that stated that all claims by employees against the employer would be submitted to arbitration. Gibson, 121 F.3d at 1128. The court did determine that the agreement only applied to claims by the employee. Id. at 1131. Because the arbitration agreement lacked a reciprocal agreement for the employer to arbitrate its claims, the court found that the agreement lacked consideration, and the agreement was unenforceable. Id. at 1130-31.

In <u>Iberia Credit</u>, cellular phone customers brought claims against their respective cellular providers. <u>Iberia Credit</u>, 379 F.3d at 162. Some of the customers' contracts contained arbitration provisions, and those providers filed motions to compel arbitration. <u>Id.</u> The arbitration provisions contained language which was one-sided and only required the customers to arbitrate their claims. <u>Id.</u> at 168. In relying on Louisiana law, the court found that such one-sided agreements were unconscionable because the agreements were not made in good faith. <u>Id.</u> at 169. The arbitration clauses only required the customer to arbitrate, and since there was no reciprocal duty on the provider, the clause was unenforceable. <u>Id.</u> at 171. Thus, in each of these cases, the courts determined that the one-sided agreements lack consideration or were unconscionable, respectively, and thus did not enforce those arbitration agreements.

Plaintiffs, however, are requesting the opposite result, that the provision be upheld and enforced as only requiring arbitration when Plaintiffs initiate a claim. Quixtar responds that the arbitration clause is mutual and that it is bound to arbitrate its claims against Plaintiffs. While the Rules at times refer to the individual parties separately and together, Quixtar argues that the Rules plainly contemplate and require that both parties will submit their disputes to arbitration. As stated in Rule 11:

> The Corporation provides a confidential dispute resolution process to address any issues that relate to your Quixtar Independent Business. *This process includes situations where an IBO may detect a potential Rule violation by another IBO or may be the subject of a claimed Rule violation themselves* and/or when the IBO has a dispute with another IBO or the Corporation. The Dispute Resolution Process begins at the point when the IBO becomes aware of a potential Rule violation or of a claim against another IBO or the Corporation and continues through each step of the process including . . . ultimately Arbitration. *The only exception is when the claim made by the IBO or the Corporation is for a debt on account . . .* then the IBO or the Corporation may elect to pursue the claim in any court of competent jurisdiction, including small claims court. *In all other cases the parties will try to resolve the dispute as provided for under these Rules.*

(Doc. #40-3, Ex. B at 2, Quixtar Rules of Conduct, Rule 11 (emphasis added).) Quixtar states that this language clearly indicates that both parties are bound to arbitrate their claims and there is only a narrow exception to the duty to arbitrate disputes arising under the Rules of Conduct and the Distributor Agreement. As stated by the Rule, in all other cases arbitration is required. (Id.)

In Bennett v. Cisco Systems, Inc., 63 Fed. App'x 202 (6th Cir. 2003), an arbitration agreement that contained "I agree" language was found to bind both parties to arbitration. Id. at 205. Bennett concerned an arbitration agreement between an employee and the employer corporation. The Sixth Circuit determined that because the language stated that disputes, not claims, with the corporation were subject to arbitration that the agreement was mutual. Id. The court found that this language contemplated arbitration of disputes initiated by either party. Id. The court distinguished its ruling from the Seventh Circuit's decision in Gibson because the contract language at issue in Gibson expressly stated that the employee's promise to arbitrate did not constitute a promise by the employer to arbitrate. Id. Thus in Gibson, the arbitration provision was clearly not mutual. Id. The agreement provision in Bennett covered all disputes between the employee and the corporation, and therefore the arbitration agreement required both parties to arbitrate their claims. Id.

The Fourth Circuit's case of O'Neil v. Hilton Head Hospital, 115 F.3d 272 (4th Cir. 1997), is also instructive, which similarly found an arbitration agreement to be mutual, even though it used language which only referred to the employee. In O'Neil, an employee sued her former employer, the hospital, for violations of the Family and Medical Leave Act. Id. at 273. The hospital's employee handbook contained an arbitration clause which required all disputes be submitted to binding arbitration. Id. The agreement provision contained language that stated that "I [the employee] agree to arbitration." Id. After the employee filed her suit, the hospital moved to stay

the suit pending arbitration. Id. The employee argued that the agreement lacked consideration because the language did not state that the hospital agreed to be equally bound to the arbitration process. Id. at 274-75.

The Fourth Circuit disagreed and found it relevant that the contract to arbitrate "was proffered by the employer," thus it clearly implied that both the employee and the hospital would be bound to the arbitration agreement. Id. at 274. "If an employer asks an employee to submit to binding arbitration, it cannot then turn around and slip out of the arbitration process itself." Id. Furthermore, the court found that the employer hospital continually demonstrated a desire and willingness to be bound to arbitration by consistently arguing it was bound to the arbitration agreement and committing to the arbitration process. Id. at 275. Therefore, the court found the arbitration provision mutual and valid. Id. at 276.

Quixtar has repeatedly shown itself willing to be bound by the arbitration process, thus demonstrating that the arbitration agreement is mutual and binding on claims by both parties. The language of the Quixtar Rules of Conduct states that any disputes arising out of or relating to the IBOs' business or the Rules of Conduct are subject to binding arbitration. By the terms of the Rules, the only disputes that are expressly exempt from arbitration are for the collection of a debt. (Doc. #40-3, Ex. B at 2, Rule 11.) The final prong of the test to determine arbitrability under Michigan law asks if the dispute is expressly exempt from the arbitration by the terms of the agreement. Armoudlian, 323 N.W.2d at 506. This dispute is not over the collection of a debt and thus not excepted from the mutual agreement to arbitrate disputes.

Furthermore, Quixtar avers that Plaintiffs agreed to be bound by the Quixtar Rules of Conduct, which includes the Arbitration Rules, when they signed their Renewal Agreements.

Plaintiffs do not dispute that they each signed a Renewal Agreement every year to continue their status as Quixtar IBOs. In signing the Renewal Agreement, Plaintiffs "agree to remain bound by the IBO Rules of Conduct, *including the Arbitration Agreement,* and all regulations and procedures outlined in the Business Reference Guide and other official Quixtar literature, as amended and published from time to time." (Doc. #45 at 6, Def. Ex. 2 (emphasis added).) The Court finds that the plain meaning of the contract and the arbitration provision requires both parties, Plaintiffs and Quixtar, to submit their disputes to binding arbitration. Therefore, Plaintiffs have not demonstrated the likelihood of success on the merits in this case.

### C.   Substantial Threat of Irreparable Injury

"The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury." Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975). The moving party must persuade the Court that the asserted irreparable harm is "neither remote nor speculative, but actual and imminent." Seigel, 234 F.3d at 1176. In order for a court to issue an injunction, the movant must show that the type of irreparable injury it will suffer is not the type of injury that can be compensated through money damages. Indeed, as the Eleventh Circuit noted in Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville, 896 F.2d 1283 (11th Cir. 1990):

> [a]n injury is "irreparable" only if it cannot be undone through monetary remedies. "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

Id. at 1285 (citing to Sampson v. Murray, 415 U.S. 61, 90 (1974)).

Plaintiffs claim "that compelling a party to arbitrate absent a valid agreement by the parties . . . to arbitrate is per se irreparable harm." Equity Sec. Trading Co. v. Gillan, Case No. 97-211-CIV-FTM-17D, 1997 U.S. Dist. LEXIS 9953, at *10 (M.D. Fla. June 23, 1997); see also Mony Sec. Corp. v. Vasquez, 238 F. Supp. 2d 1304, 1308 (M.D. Fla. 2002). Plaintiffs continually claim that they did not agree to be bound to arbitration when Quixtar initiates the claim. Therefore, Plaintiffs argue that they will be irreparably harmed by the mere act of participating in the arbitration.

Quixtar contends that "the law in the Eleventh Circuit provides that any harm presumably suffered by having to arbitrate does not constitute irreparable harm." (Doc. #40 at 16.) Quixtar cites to Rollins, Inc. v. Garrett, Civ. No. 6:05-cv-671-PCF-KRS, 2005 WL 2149293 (M.D. Fla. Sept. 6, 2005), aff'd, 176 Fed. App'x 968 (11th Cir. 2006), for this proposition. In Rollins, Garrett entered into an extermination contract with Orkin, which contained an arbitration provision. Id. at *1. Garrett filed a demand for class action arbitration; Orkin argued that the arbitration provision only applied to individual claims. Id. The arbitration panel determined that the arbitration agreement allowed class action issues, and issued a partial final award allowing the class action arbitration to proceed. Id. at *2. Orkin filed a motion to vacate the award in district court, which was denied; thereafter, Orkin appealed to the Eleventh Circuit. Id.

During the time of the appeal, the arbitration continued, so Orkin moved to enjoin the arbitration pending the appeal. Id. The alleged irreparable harm to Orkin was the financial burden of continuing with the arbitration and being forced to participate in an arbitration to which it did not agree. Id. at *3. In considering this argument, the court found that mere expenditure of time and money did not rise to the level of irreparable harm. Id. at *3-4. The court stated that "[t]he harm suffered in having to litigate a dispute in a forum not of one's choosing is no different from the harm

suffered after having a motion to dismiss or motion for summary judgment denied, or having one's case transferred or remanded to a different court." Id. at *4.

The Court finds this reasoning persuasive. "The financial burden of arbitration does not constitute irreparable injury. Binding precedent establishes the general proposition that injuries in terms of money, time and energy necessarily expended in the absence of a stay are not irreparable." United Paperworkers Int'l, Local #395 v. ITT Rayonier, Inc., 752 F. Supp. 427, 431 (M.D. Fla. 1990). The Court has already determined that Plaintiffs are unlikely to succeed on the merits, and they are bound to arbitrate Quixtar's claims. Moreover, a court may vacate an arbitration award "where the arbitrators exceeded their powers." 9 U.S.C. § 10. If it is later determined that the claims are not arbitrable, any arbitration award may be vacated as exceeding the scope of the arbitration agreement. Thus, there will be no harm to Plaintiffs other than the expenditure of money and time. Such an injury is not irreparable.

### D.     Balance of Hardships

In order for a court to grant a preliminary injunction, the threatened injury to the plaintiff must outweigh the harm an injunction may cause the defendant. All Care Nursing, 887 F.2d at 1537. Plaintiffs argue that the balance of hardship favors them because they should not be subject to arbitration to which they did not agree. However, the Court has already determined that Plaintiffs have not demonstrated a likelihood of success on the merits and Plaintiffs did agree to the arbitration provision. Quixtar avers that it will suffer great financial harm if arbitration is further delayed, particularly since Plaintiffs are allegedly continuing the conduct which is the basis of the underlying dispute. The court finds that the threatened injury to Quixtar to be great and the balance of hardship favors Quixtar.

### E. Public Interest

Granting a preliminary injunction must not be adverse to the public interest. <u>All Care Nursing</u>, 887 F.2d at 1537. Plaintiffs argue that the public interest requires that parties should only be compelled to arbitrate matters included in the arbitration agreement, and questions of arbitrability should be determined by a court prior to the commencement of arbitration proceedings. Quixtar responds that public policy favors arbitration, and that where the parties have agreed to arbitrate, courts should enforce those agreements.

The Federal Arbitration Act states:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "The [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." <u>Moses H. Cone Mem'l Hosp. v. Mercury Construc. Corp.</u>, 460 U.S. 1, 24-25 (1983); <u>see</u> <u>also</u> <u>AT&T Techs.</u>, 475 U.S. at 650 ("[I]t has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability . . . .).

The Court recognizes that arbitration is a matter of contract, and parties cannot be required to submit to arbitration where they have not agreed to arbitrate, <u>see</u> <u>AT&T Techs.</u>, 475 U.S. at 648; however, public policy favors arbitration. While the Court will not force parties to arbitrate matters they have not agreed to arbitrate, the plain language of the parties' agreement binds both the Plaintiffs and Quixtar to arbitrate disputes arising out the Quixtar business. The public interest

certainly does not support the expenditure of judicial resources to enjoin arbitration where there is a valid arbitration agreement between the parties.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

Plaintiffs' Motion for Preliminary Injunction (Doc. # 29) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this 28th day of March, 2008.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:
All Counsel of Record